UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VOLKSWAGEN GROUP OF AMERICA, INC., | Case No. 21-cv-04895-JST |
| Plaintiff, | |
| v. | **ORDER GRANTING MOTION TO DISMISS COUNTERCLAIMS II-VI** |
| SMARTCAR, INC., | Re: ECF No. 101 |
| Defendant. | |

Before the Court is Plaintiff-Counterclaim Defendant Volkswagen Group of America, Inc.'s ("VWGoA") motion to dismiss counterclaims asserted by Defendant-Counterclaim Plaintiff Smartcar, Inc. ("Smartcar").   ECF No. 101.  The Court will grant the motion.

# I.    BACKGROUND

## A.    Factual Background

For the purpose of resolving this motion, the Court accepts as true the allegations in Smartcar's counterclaim complaint.  ECF No. 98 at 15–47; *see Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

### 1.    Telematics Data

The operation of consumer vehicles generates telematics data, including information about mileage, fuel consumption, braking and acceleration, and many other aspects of the car's performance.  Counterclaim Compl.,[1] ECF No. 98 at 15 ¶ 2.  "Nearly every car shipped is internet

---

[1] The Counterclaim Complaint begins on page 15 of ECF No. 98.  The first fifteen pages of the document contain Smartcar's Answer and affirmative defenses, which also consist of numbered paragraphs.  For simplicity's sake, the Court cites allegations from the Countercomplaint using the paragraph numbers they bear in that document without specifying the page number in ECF No. 98 on which each allegation is found.

connected." *Id.* ¶ 23.  Telematics data can be useful to drivers and to a range of third parties; for example, repair shops can reference it to facilitate maintenance or repairs, and insurance companies can monitor it to incentivize safe driving.  *Id.* ¶¶ 28, 45–46.

Automobile original equipment manufacturers ("Automobile OEMs") control "the type of data generated and stored on the vehicle."  *Id.* ¶ 28.  "The National Highway Traffic Safety Administration currently mandates that all vehicles in the United States be compliant with the OBD-II specification, which means anyone equipped with the correct device can access the OBD-II vehicle diagnostics data by physically accessing the port.  However, not all vehicle data generated by certain vehicles can be accessed with the OBD-II port."  *Id.* ¶ 29.   In addition, many Automobile OEMs now outfit vehicles with a "cellular-based telematics control unit" ("TCU").  *Id.* ¶ 30.  The TCU records and stores detailed data beyond that which the OBD-II port can capture, *id.*, and enables remote control of certain functions, such as unlocking and locking the car using a smartphone, *id.* ¶¶ 27, 60.  Although drivers theoretically could use the TCU to transmit their vehicle's data to anyone with an internet connection, TCUs are "designed to be secure and prevent[] unauthorized modification to the data or unauthorized access."  *Id.* ¶¶ 30–31.

### 2.    Smartcar

Defendant Smartcar was founded in 2014 as a "mobility application developer platform for cars."  *Id.* ¶ 15.  Its application programming interface ("API") allows application developers to design applications that are compatible with vehicles from various Automobile OEMs.[2]  *Id.* ¶¶ 33–34.  The API also makes it possible for consumers to use applications that were not designed for their specific vehicle.  *Id.* ¶¶ 2, 33–34.  Without such a platform, developers would need to customize the code of their applications for each make of car, and consumers would only be able to use applications designed for their particular cars.  *See id.* ¶¶ 17–19.  Applications that use Smartcar's API require drivers to "agree to share specific vehicle telematics data" from an application pre-installed by the Automobile OEMs that allows the user to remotely access their vehicle's data and controls.  *Id.* ¶ 19.

---

[2] Some Automobile OEMs create their own proprietary APIs.  ECF No. 98 ¶ 23.

Smartcar's business has flourished in "the last nine years," and it has become "the leading developer platform for mobility businesses." *Id.* ¶¶ 18, 24. Users of its API span several sectors, including insurance providers, car sharing businesses, state agencies, electric utility providers, independent repair shops, and ride hailing companies. *Id.* ¶ 20. Smartcar has built integrations with "thirty-seven car brands in North America and in Europe" and "has over 10,000 registered application developers." *Id.* ¶ 22; *see also id.* ¶ 93 (applications developed on Smartcar's API are compatible "with a majority of the over forty-two Automobile OEM brands in the United States"). "Several Fortune 500 companies have adopted Smartcar's technology and its API . . . ." *Id.* ¶ 22.

### 3.   VWGoA

Like other Automobile OEMs, VWGoA uses TCUs with security features restricting "interoperability," that is, limiting data access to the Automobile OEM and approved third parties. *Id.* ¶ 31; *see id.* ¶ 39. Drivers who lease or purchase VWGoA vehicles ("VWGoA Owners") have the option to purchase connectivity services, such as *Car-Net*, *Audi connect*, and *myAudi* (collectively, "VWGoA Services"), that allow them to connect to and control their vehicles using their smartphones and computers. *See id.* ¶ 27. "[B]ecause of the security features built into" the TCUs, VWGoA requires VWGoA Owners subscribing to the VWGoA Services to sign user agreements restricting their right to resell the data that their vehicle generates or distribute it for commercial purposes without VWGoA's approval. *Id.* ¶ 39; *see id.* ¶¶ 40–43. The data-sharing restriction is an express condition in the user services agreement. *Id.*; *see id.* ¶ 153.

### 4.   Data-Sharing Restriction

Because VWGoA Owners cannot share their data under the terms of the VWGoA Services, they cannot use applications that were developed with Smartcar's API. *See, e.g.*, *id.* ¶ 41. They can only use applications from VWGoA or third-party developers that VWGoA approves. *See, e.g.*, *id.* ¶¶ 27, 31–32; *see also id.* ¶ 172 (VWGoA provides access to "its own service providers and dealers"). VWGoA has not approved Smartcar as a partner. *See id.* ¶ 57.

Limiting VWGoA Owners' use of their data to "personal, non-commercial use," means they must "accept unwanted services (i.e., VWGoA's Services)" to access their data, which "coerce[s] and steer[s] VWGoA Owners to use VWGoA's selected service providers," such as

repair services and data services.  *Id.* ¶¶ 56–58.  Although VWGoA has not sought to enforce these agreements against VWGoA Owners who use password storage vaults or give their family members their password, they have sought to enforce the agreement against Smartcar.  *Id.* ¶ 57.

### 5.    Anticompetitive Effects of Restriction

Smartcar alleges that the terms of the VWGoA Services user agreement "unlawfully tie the data (both the data itself and access to the data) from [VWGoA] Owners to the use of VWGoA's Services."  *Id.* ¶ 151.  It identifies the tying product as "data access," *id.* ¶ 122, or "the vehicle data and/or data access," *id.* ¶¶ 136, 154, and the tied product as the "data processing/storage services aspect of VWGoA Services," *id.* ¶ 122, or "VWGoA's Services," *id.* ¶¶ 136, 154.  It alleges that the "tying markets" consist of "either the telematics data market and/or telematics data access market," *id.* ¶¶ 134, 152,  while the "tied markets" are "the data processing (e.g. application developers), data storage (e.g. cloud and/or personal storage), and other usage data market (other services using such data)," *id.* ¶ 134.

Smartcar next alleges that VWGoA has monopoly power in several different markets as a result of the data-sharing restriction.  It monopolizes the markets for data from VWGoA vehicles, *see, e.g.*, *id.* ¶¶ 60, 86, 165, 168, and for access to VWGoA vehicle data, *id.* ¶¶ 165, 168.  It also monopolizes the "telematics data market" and "telemetry data access market" at large.  *Id.* ¶¶ 149, 166; *see also id.* ¶ 150 (alleging that the "telematics data market" consists of "just VWGoA and no one else").  It has "overwhelming monopoly power in the application development and data storage market."  *Id.* ¶ 134.  Finally, VWGoA monopolizes the markets for data processing, data storage, and data services, *id.* ¶¶ 167–68, and monopolizes or attempts to monopolize other "relevant markets," a category which seems to include the market for vehicle repairs, among others, *id.* ¶ 149.

The data-sharing restriction means that "VWGoA Owners face higher prices and reduced quality of service they receive from telematics-enabled applications . . . ."  *Id.* ¶ 89.  VWGoA Owners "have no option to further process the data" from their vehicles, leaving them "at the mercy of VWGoA's limited sets of features and monopolistic pricing," with "limited choices in the aftermarket for data processing services."  *Id.*  Because vehicles are expensive, VWGoA

1   Owners face high switching costs that impede them from switching to another Automobile OEM.

2   *Id.* ¶¶ 8, 90.

3   Because it cannot access VWGoA Owners' data, Smartcar "has lost market share."

4   *Id.* ¶ 96.  Fewer drivers "can use applications enabled by Smartcar's API" than would be able to if

5   Smartcar applications were compatible with VWGoA vehicles.  *Id.*  "Application Developers who

6   use Smartcar's API therefore do not enter the market due to the risk imposed by VWGoA's

7   control over the data generated by its vehicles."  *Id.*  Smartcar has also "lost asset value vis-à-vis

8   the reduction in value of the intellectual property protecting Smartcar's API" as well as "current

9   and potential future customers."  *Id.* ¶ 97.  VWGoA has "foreclos[ed] Smartcar from "competing

10   [in] markets using the telematics data market and vehicle telemetry data access, including in data

11   processing, data storage, and other data services."  *Id.* ¶ 158.

12   Beyond Smartcar or the market for its API, the VWGoA Services terms of use affect

13   various sectors that use or could potentially use telematics data to provide services.  *Id.* ¶¶ 44–52.

14   If VWGoA Owners could "trade their own data for services through Smartcar's API," Smartcar

15   alleges that would "enable[] the creation of numerous businesses," *id.* ¶ 44, and foster innovation

16   in sectors including repair services, insurance companies, government entities, and utility

17   companies, *id.* ¶¶ 45–52; *see, e.g.*, *id.* ¶ 48 ("Smartcar's API is essential to allowing insurance

18   companies [that] build applications to obtain all of the data they need.").  "Businesses reliant on

19   [telematics] data . . . face higher costs from reduced data availability" that results from VWGoA's

20   user agreements.  *Id.* ¶ 89.

21   Existing businesses that use telematics data are also constrained by the inability to access

22   VWGoA Owners' data without permission from VWGoA.  *Id.* ¶ 91.  "The access to telematics

23   data provided by Smartcar's API has attracted independent businesses and start-ups to develop

24   new and innovative products that improve the lives of everyday Americans. . . . VWGoA is

25   putting those businesses (including repair and fleet management competitors to VWGoA) at a

26   competitive disadvantage . . . ."  *Id.*

27   Application developers are particularly affected.  Without VWGoA Owners' data provided

28   via Smartcar, application developers "would have to expend significant time and resources to

United States District Court
Northern District of California

United States District Court
Northern District of California

develop an API for each individual vehicle manufacturer." *Id.* ¶ 94.  Where application developers' "access to data would be at the whim of each vehicle manufacturer such as VWGoA," the developers face the risk of developing an application that VWGoA would reject.  This risk and increased costs "will cause the market for applications to evaporate." *Id.*

The user services agreements thereby further VWGoA's alleged mission to "quash all competitors for telematics data related services for its vehicles—Smartcar included—and seek[] control over emerging markets that use automotive telematics data to provide important services to VWGoA Owners, innovative businesses, researchers, and governments." *Id.* ¶ 7.

### 6.    Alliance for Automotive Innovation Commitment

VWGoA is a member of the Alliance for Automotive Innovation.  *Id.* ¶ 101.  In the summer of 2023, the Alliance publicly reaffirmed and updated an Automotive Repair Data Sharing Commitment ("the Commitment") originally made in 2014 "to ensure access to vital vehicle data for the industry," an industry to which Smartcar alleges it belongs.  *Id.*  The Commitment included statements affirming that VWGoA would ensure repair facilities' and VWGoA Owners' ability to access their vehicles' data, for example:

> Telematics systems shall not be used to circumvent the commitments made in this commitment to provide independent repair facilities with access to vehicle diagnostic data.  To the extent that specific telematic diagnostic and repair data is needed to complete a repair, and also provided to an automaker's authorized dealers, the automaker shall make such information available to VWGoA Owners and independent repair facilities, if it is not otherwise available through a tool or third-party service information provider.

*Id.* ¶ 102; *see also id.* ¶¶ 103–05.

Smartcar alleges that this Commitment binds VWGoA to "express or implied contractual commitments," *id.* ¶ 178, of which Smartcar is "at least a third-party beneficiary," *id.* ¶ 179. Specifically, the Commitment means that VWGoA "is contractually obligated to provide means of accessing telematic data available to vehicle owners and service information providers and to provide means for accessing the same functional capabilities that VWGoA makes available to its dealers . . . on fair and reasonable terms." *Id.* ¶¶ 180–81.

"Despite these promises, VWGoA maintains its take-it-or-leave it terms of service that

1    prevent Vehicle Owners from accessing their own data." *Id.* ¶ 106; *see also id.* ¶ 182 ("VWGoA

2    has breached its obligations by failing to provide such means, and by failing to offer any means on

3    fair and reasonable terms.").

4          This "contractual breach" has caused Smartcar to be "injured in its business or property,

5    and [to be] threatened by imminent loss of profits, loss of customers and potential customers, and

6    loss of goodwill and product image." *Id.* ¶ 183.

7          **B.      Procedural History**

8          Because the Court summarized the procedural history of this action in its July 12, 2023,

9    order resolving Smartcar's motion to dismiss VWGoA's complaint, ECF No. 79 at 4, it recites

10   only relevant developments here.

11         VWGoA filed its second amended complaint on November 16, 2023.  ECF No. 95.  On

12   December 26, 2023, Smartcar filed its answer and counterclaim complaint.  Smartcar asserts

13   counterclaims for (1) declaratory judgment of no false association; (2) violation of California's

14   Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; (3) violation of the

15   Cartwright Act, Cal. Bus. & Prof. Code § 16700, *et seq.*; (4) unlawful tying in violation of the

16   Sherman Act, 15 U.S.C. § 1; (5) monopolization in violation of the Sherman Act, 15 U.S.C. § 2;

17   and (6) breach of contract.  Counterclaim Compl. ¶¶ 107–84.

18         Now before the Court is VWGoA's motion to dismiss all counterclaims except the claim

19   for declaratory judgment of no false association.  Smartcar opposes the motion, ECF No. 102, and

20   VWGoA has replied, ECF No. 104.

21   **II.     JURISDICTION**

22         The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367.

23   **III.    LEGAL STANDARD**

24         To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a

25   complaint must contain "a short and plain statement of the claim showing that the pleader is

26   entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Dismissal "is appropriate only where the complaint

27   lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."

28   *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).

United States District Court
Northern District of California

7

1    "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

2    relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl.*

3    *Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff

4    pleads factual content that allows the court to draw the reasonable inference that the defendant is

5    liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  While this standard is not "akin to a

6    'probability requirement' . . . it asks for more than a sheer possibility that a defendant has acted

7    unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).  "Where a complaint pleads facts that are

8    'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and

9    plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

10   In determining whether a plaintiff has met the plausibility requirement, a court must

11   "accept all factual allegations in the complaint as true and construe the pleadings in the light most

12   favorable" to the plaintiff.  *Knievel*, 393 F.3d at 1072.

## IV.    DISCUSSION

### A.    Requests for Judicial Notice and Incorporation by Reference

The Court first addresses Smartcar's unopposed requests for judicial notice or

incorporation by reference of five documents.  ECF No. 102-2; *see* Fed. R. Evid. 201(b).

Smartcar requests that the Court take judicial notice of (1) the *Audi Connect* Terms of

Service; (2) the *Car-Net* Terms of Service; (3) the Letter from the Automotive Service

Association, the Society of Collision Repair Specialists, and the Alliance for Automotive

Innovation to various Congressional Leaders attaching the "Automotive Repair Data Sharing

Commitment," dated July 11, 2023 ("the Commitment");[3] (4) the Memorandum of Understanding

and R2R Agreement, by and between the Automotive Aftermarket Industry Association, Coalition

for Auto Repair Equality, Alliance of Automobile Manufacturers and Association of Global

Automakers, dated January 15, 2014; and (5) Commission Regulation 2023/2854 of the European

Parliament and of the Council of 13 December 2023 on Harmonised Rules on Fair Access to and

Use of Data and Amending Regulation Commission Regulation 2017/2394 and Council Directive

United States District Court
Northern District of California

---

[3] VWGoA also attached the Commitment as an exhibit to its motion to dismiss.  ECF No. 101-1.

2020/1828 (Data Act), O.J. (L 2854).  ECF No. 102-2 at 2–3.  The request is unopposed.

"Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6) . . . ."  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).  An exception allows a court to consider "matters of public record without converting a motion to dismiss into a motion for summary judgment.  But a court cannot take notice of disputed facts contained in such public records."  *Id.* at 999 (internal citation omitted).  The Court grants Smartcar's requests for judicial notice of each of the listed documents, but, unless it finds below that the document has also been incorporated by reference, limits "the judicially noticed fact in each instance . . . to the existence of the document, not the truth of the matters asserted in the documents."  *Salas v. Gomez*, 2016 WL 3971206, at *5 (N.D. Cal. July 25, 2016).

Smartcar also argues that its complaint incorporates by reference the first four of the above-mentioned documents.  "Unlike rule-established judicial notice, incorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself."  *Khoja*, 899 F.3d at 1002.  "Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim."  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003); *see also In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1058 n.10 (9th Cir. 2014) (stating that a document may be "consider[ed] . . . in its entirety" where plaintiffs "rel[ied] on portions of it in their complaint"); *Stearns v. Select Comfort Retail Corp.*, No. 08-2746 JF, 2009 WL 1635931 (N.D. Cal. June 5, 2009) (explaining that incorporation by reference applies to documents "referenced extensively in the complaint and which are accepted by all parties as authentic").

Smartcar refers to and quotes from the *Audi Connect* Terms of Service and *Car-Net* Terms of Service throughout its complaint, and these documents largely form the basis for its antitrust claims.  *See* Counterclaim Compl. ¶¶ 26–27, 32, 40–41, 120–21, 126, 135, 149–55, 165–66. Smartcar bases its claim for breach of contract on the Commitment and quotes extensively from it in its complaint.  *See id.* ¶¶ 101–06, ¶¶ 177–84.  These documents are accepted by all parties as

9

authentic and are not being incorporated "merely [to] create[] a defense to the well-pled allegations in the complaint." *Khoja*, 899 F.3d at 1002. Accordingly, the Court finds that they are incorporated by reference and may consider their contents without converting the motion to dismiss into a motion for summary judgment.

In contrast, Smartcar references the 2014 Memorandum of Understanding ("MOU") in only one allegation, *see* Counterclaim Compl. ¶ 101, and this document does not form the basis of its claims. The Court therefore finds that the complaint has not incorporated the 2014 MOU by reference and limits its consideration to the taking also judicial notice.

## B. Sherman Act

Smartcar asserts two claims against VWGoA under the Sherman Act: (1) unlawful tying in violation of Section 1; and (2) monopolization in violation of Section 2. Counterclaim Compl. ¶¶ 146–76. VWGoA moves to dismiss both claims on the grounds that Smartcar fails to define a relevant geographic or product market and that Smartcar lacks antitrust standing.

"In order to state a valid claim under the Sherman Act, a plaintiff must allege that the defendant has market power within a 'relevant market.' That is, the plaintiff must allege both that a 'relevant market' exists and that the defendant has power within that market." *Newcal Indus., Inc. v. Ikon Off. Solution*, 513 F.3d 1038, 1044 (9th Cir. 2008); *see FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) ("A threshold step in any antitrust case is to accurately define the relevant market.").[4]

The relevant-market inquiry is the same for Section 1 and Section 2 of the Sherman Act. *See, e.g.*, *Newcal Indus., Inc.*, 513 F.3d at 1044 n.3; *Blizzard Ent. Inc. v. Ceiling Fan Software*

---

[4] Smartcar incorrectly asserts that it is "not even required as a matter of law to plead separate facts about market definition" because VWGoA "admits it controls market entry to the exclusion of all other competitors." ECF No. 102 at 18. The "admissions" that Smartcar argues are contained in VWGoA's Second Amended Complaint, not Smartcar's complaint, and the Court does not consider them in assessing the sufficiency of Smartcar's allegations. In any event, while "direct evidence" of supracompetitive pricing and restricted output can sometimes establish market power, *see Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995), it does not eliminate the need to accurately define the relevant market, which is the "threshold step in any antitrust case." *Qualcomm*, 969 F.3d at 992; *see also Intel Corp. v. Fortress Inv. Grp. LLC*, 511 F. Supp. 3d 1006, 1020 (N.D. Cal. 2021) ("[I]n order to assess whether Defendants' conduct has had anticompetitive effects, [the court] must first have an understanding of what the relevant market is.").

United States District Court
Northern District of California

*LLC*, 941 F. Supp. 2d 1227, 1231 (C.D. Cal. 2013); *Apple Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1196 (N.D. Cal. 2008). For both sections, a relevant market defines "the field in which meaningful competition is said to exist." *Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 955 (9th Cir. 2023). "A relevant market contains both a geographic component and a product or service component." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 975 (9th Cir. 2023) (citing *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018)).

"[T]he validity of the 'relevant market'" is often a factual issue that cannot be resolved at the pleading stage. *Newcal*, 513 F.3d at 1045. "There are, however, some legal principles that govern the definition of an antitrust 'relevant market,' and a complaint may be dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially unsustainable." *Id.* (citation omitted).

The Ninth Circuit's opinion in *Newcal* articulates the requirements for facial validity. "First and foremost, the relevant market must be a *product* market. The consumers do not define the boundaries of the market; the products or producers do." *Id.* (emphasis in original) (citing *Brown Shoe v. United States*, 370 U.S. 294, 325 (1962)). Second, the alleged market "must encompass the product at issue as well as all economic substitutes for the product." *Id.* (citing *Brown Shoe*, 370 U.S. at 325); *see also Brown Shoe*, 370 U.S. at 325 ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."); *Coronavirus Rep.*, 85 F.4th at 955 ("The principle most fundamental to product market definition is cross-elasticity of demand for certain products or services." (internal quotation marks and citation omitted)). A properly defined market includes all sellers or producers "who have actual or potential ability to deprive each other of significant levels of business." *Newcal*, 513 F.3d at 1045 (quoting *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989) (internal quotation marks omitted)). Third, the *Newcal* court specified that "it is legally permissible to premise antitrust claims on a submarket." *Id.* Courts use "practical indicia" to assess the boundaries of an economically distinct submarket, such as the "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities,

distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.* (quoting *Brown Shoe*, 370 U.S. at 325 (internal quotation marks omitted)).

In addition, "[a] relevant market can be an aftermarket in which demand depends entirely upon prior purchases in a foremarket." *Coronavirus Rep.*, 85 F.4th at 955 (citing *Epic Games, Inc.*, 67 F.4th at 975 (additional citations omitted)). "However, such a market generally shows that the defendant exploited consumers' unawareness of the restrictions on the aftermarket and must still show the crosselasticity required to define a market." *Id.*

Like the other elements of an antitrust claim, an alleged market need not be pleaded with specificity; it will survive a 12(b)(6) motion to dismiss "unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect." *Newcal Indus., Inc.*, 513 F.3d at 1045. However, "[f]ailing to define a relevant market alone is fatal to an antitrust claim" because without an adequate market definition, the Court "cannot sensibly or seriously assess market power." *Coronavirus Rep.*, 85 F.4th at 957 (first citing *Qualcomm*, 969 F.3d at 992; and then citing *Epic Games*, 67 F.4th at 975); *see also Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018) ("Without a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition." (alteration in original) (internal quotation marks and citation omitted)).

Applying these principles, the Ninth Circuit has affirmed dismissal of a complaint where plaintiffs failed to define a market clearly enough to permit the district court to assess its legal cognizability. *See Coronavirus Rep.*, 85 F.4th at 956 ("Even if we were to review the narrower set of markets posited in Plaintiffs-Appellants' Motion to Strike, the alleged markets lack sufficient clarity to state an antitrust claim plausibly."). And district courts in the Ninth Circuit regularly grant 12(b)(6) motions based on failure to adequately allege a relevant market. *See, e.g.*, *Psystar Corp.*, 586 F. Supp. 2d at 1195–1203; *Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1106–09 (N.D. Cal. 2022); *Pistacchio v. Apple Inc.*, No. 4:20-CV-07034-YGR, 2021 WL 949422, at *2–3 (N.D. Cal. Mar. 11, 2021).

### 1.    Relevant Product Markets

Here, Smartcar has not adequately defined the relevant market or markets underlying its

claims.  Smartcar refers to approximately fourteen different product markets in its complaint

without clarity regarding their boundaries or relationships to one another.  These markets include:

(1) a VWGoA telematics data market, Counterclaim Compl. ¶¶ 60, 86, 121, 148, 164–65; (2) a

vehicle telematics data market or general telematics data market, *id.* ¶¶ 9, 134, 137, 150, 152, 158,

166; (3) a market for access to VWGoA telematics data, *id.* ¶¶ 148, 164–65, 168; (4) a vehicle

telemetry data access market, *id.* ¶¶ 149, 158, 168; (5) a market for access to telematics data

generally, *id.* ¶¶ 92, 134, 152, 166; (6) a market for data services generally, *id.* ¶¶ 38, 121, 134,

140, 148, 167; (7) a data processing services market, *id.* ¶¶ 89–91, 121, 134, 140, 148, 167–68; (8)

a market for processing vehicle data, *id.* ¶ 85; (9) a data storage market, *id.* ¶¶ 121, 134, 140, 148,

167–68; (10) a market for applications or application development, *id.* ¶¶ 34, 88, 94–96, 126, 134,

137; (11) an automobile or vehicle market, *id.* ¶¶ 38, 90; (12) a repair services market,

*id.* ¶¶ 45–46, 51, 67; (13) an insurance market, *id.* ¶¶ 47–48, 51, 67; and (14) a utilities market,

*id.* ¶¶ 49, 51, 67.[5]

VWGoA argues that Smartcar's shifting terminology and lack of allegations defining the

markets in terms of the products and substitutes they include or cross-elasticity of demand makes

the claim incoherent.  ECF No. 101 at 19–21.  It also criticizes the complaint for failing to allege

the geographical scope of any relevant markets.  *Id.* at 18–21.

Smartcar responds that it has adequately alleged several markets and services, including "a

relevant market encompassing (1) VWGoA's Service—the service includes a feature where

VWGoA provides Telematics Data to Application Developers, and (2) Smartcar's API that

includes Smartcar's service of providing VWGoA Telematics Data to Application Developers."

ECF No. 102 at 24; *see id.* at 19–20 (explaining Smartcar's theory of the relationships among a

"telematics data" product market and several service markets).  It asserts that that Smartcar's API

and VWGoA Services are substitute goods based on allegations that application developers can

---

[5] Smartcar also refers repeatedly to potential markets for "other innovations" and "emerging
markets" that, like repair services, insurance, and utilities, it alleges are "reliant on" the provision
of VWGoA's telematics data for their existence.  Counterclaim Compl. ¶¶ 7–8, 44–52.  Still other
allegations refer to unspecified "relevant markets" in which Smartcar's competition is constrained.
*See, e.g.*, *id.* ¶¶ 119, 144.

1   pay either Smartcar or VWGoA Services for access to telematics data needed to create their

2   applications.  *Id.*  But the Court cannot use these clarifications—which still do not explain the

3   many inconsistent markets proposed in the complaint—to fill gaps in the allegations; its "[r]eview

4   is limited to the complaint."  *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001)

5   (internal quotation marks and citation omitted).

6           In *Coronavirus Reporter*, the Ninth Circuit recently affirmed a district court's dismissal of

7   a complaint where the allegations failed to define a relevant market on which plaintiffs could base

8   their claims.  85 F.4th at 956–57.  The court's descriptions of the allegations in that case call to

9   mind the complaint here.

> Plaintiffs-Appellants' FAC alleged in scattergun fashion that there
> were at least fifteen "relevant markets" pertinent to its antitrust
> claims but made no effort at all to define the markets or to
> distinguish them from one another.  For example, Plaintiffs-
> Appellants did not clarify whether the markets that Plaintiffs-
> Appellants identified are completely different from one another or
> whether they overlap.

14  *Id.* at 956 (footnote omitted).  Like the *Coronavirus Reporter* plaintiffs, Smartcar peppers the

15  complaint with market names but fails to allege their boundaries, how they relate to one another,

16  or their geographical scope.

17          The Court has identified three main categories of markets that Smartcar alleges, though the

18  name and scope of each one varies throughout the complaint.  The Court below examines the

19  allegations regarding (1) a data processing services market; (2) an applications market; and (3) a

20  telematics data access market to illustrate some of the discrepancies that prevent the complaint

21  from stating a plausible claim.  The Court also discusses the lack of allegations defining any

22  market's geographic scope.  At bottom, the vague markets alleged in the Smartcar's counterclaims

23  fall short of the requirement to define a "legally sufficient" product market "with reference to the

24  rule of reasonable interchangeability and cross-elasticity of demand."  *Reilly*, 578 F. Supp. 3d at

25  1109 (internal quotation marks and citation omitted).  Without an adequately defined relevant

26  market, its Sherman Act claims are facially unsustainable, and the Court "need not proceed further

27  with the analysis."  *Coronavirus Rep.*, 85 F.4th at 957.

28          **a.      Market for Data Processing Services**

14

1    One market to which the complaint refers, by a variety of names, is the data processing or

2    data processing services market.  In some allegations, this market includes data storage and other

3    unspecified "data services," but it also appears listed separately from apparently distinct data

4    storage or data services markets.  *Compare* Counterclaim Compl. ¶ 121 (referencing "the market

5    for data services[,] including data processing and storage services")*, and id.* ¶ 167 (alleging that

6    VWGoA "unlawfully maintains monopoly power data processing, data storage, and data

7    services"), *with id.* ¶ 89 (noting "limited choices in the aftermarket for data processing services")*,

8    and id.* ¶ 134 (describing separate "tied markets" for "data processing (e.g. application

9    developers), data storage (e.g. cloud and/or personal storage), and other usage data market (other

10   services using such data)").  The complaint also refers to the "market for processing vehicle data,"

11   which presumably would be narrower than the market for all data processing, but this distinction

12   is unexplained.  *Id.* ¶ 85.  Similarly, when the complaint alleges that VWGoA has "overwhelming

13   monopoly power in the application development and data storage market," it is not clear if these

14   combined terms refer to a single, distinct market.  *Cf. id.* ¶ 167 ("VWGoA also unlawfully

15   maintains monopoly power data processing, data storage, and data services.").

16       It is clear enough that Smartcar alleges that Smartcar is a data processing service.  *See

17   id.* ¶ 80.  Accordingly, the Court may infer that Smartcar's API is a product within that market.

18   And because VWGoA's product, VWGoA Services, is alleged to compete with data processing

19   services, the Court may infer that VWGoA Services allegedly belongs in this market as well.  *See

20   id.* ¶ 78.  *But see id.* ¶ 134 (alleging that the "tied markets," which would encompass VWGoA

21   Services as the alleged tied product, are "the data processing (e.g. application developers), data

22   storage (e.g. cloud and/or personal storage), and other usage data market (other services using

23   such data)" markets).  But the complaint lacks factual support for the implied allegation that these

24   products are substitutes or any other information about the scope of the data processing services

25   market and its relationship to the many others alleged.

26       Further, the complaint seems to allege that access to telematics data is a product in the data

27   processing services market that Smartcar and VWGoA both provide.  *See id.* ¶ 91 (under the

28   heading "[d]estruction of existing data processing services in the market," describing "telematics

United States District Court
Northern District of California

data provided by Smartcar's API" and VWGoA's "withholding or terminating such access [to telematics data]").[6]  But elsewhere, telematics data and telematics data access are described as separate markets, *see, e.g.*, *id.* ¶¶ 60, 86, 121, 134, 137, 148, 150, 164–66.  The allegations regarding that potential market are discussed further below.

> ### b.  Applications Market

Smartcar also alleges an "applications market" that is distinct from the data processing market.  *See, e.g.*, *id.* ¶ 88 ("applications market participants"), *id.* ¶ 94 ("VWGoA's conduct will cause the market for applications to evaporate.").  Smartcar names some products that the Court infers would belong to this market, such as "telematics-enabled applications," *id.* ¶ 89, "fleet management applications," *id.* ¶ 95, and "applications enabled by Smartcar's API," *id.* ¶ 96.  Although the complaint never clarifies the market's scope, its broad name implies that it could encompass applications that run on vehicles as well as those that run on other devices, such as mobile phones.

The complaint is also silent about how this market relates to the data processing market discussed above.  Smartcar alleges that "application developers" belong to the data processing market, not the applications market.  *Id.* ¶ 134.  Because "application developers" are a category of producer rather than a product, one possibility is that Smartcar intends to allege that application development services are a product in the data processing services market, while the applications themselves are a separate product in a separate market.  The complaint is also unclear about the extent to which "application developers" encompasses repair service providers, insurance companies, and similar businesses, so the Court is left guessing as to the degree of overlap among the data processing services market, the application market, and the markets for repairs, insurance, and other services to which Smartcar refers.  There are too many open questions about the arena of competition for these claims to proceed past the pleading stage.

---

[6] Elsewhere, Smartcar is also described as a consumer, rather than a provider, of access to telematics data.  *See id.* ¶ 51 ("Withholding Smartcar's and the public's access to telematics data is endangering the existence of various Application Developers.").

United States District Court
Northern District of California

**c.     Telematics Data Access Market**

The final category—assuming the Court is parsing the counterclaims correctly—includes various markets related to telematics data or telematics data access. As discussed above, some allegations in the complaint imply that "data access," "telematics data access," or similar terms are products in the data processing services market. *See, e.g.*, *id.* ¶¶ 91, 122, 134. The complaint also alleges, however, several variations of a "telematics data market" or "telematics data access market." For example, Smartcar lists "the market for [VWGoA] Owners' data" separately from "the market for data services including data processing and storage services" in at least one allegation. *Id.* ¶ 121. And in describing the alleged unlawful tying arrangement, Smartcar asserts that "vehicle data and/or data access," the tying product, *id.* ¶ 136, belongs to "either the telematics data market and/or telematics data access market," *id.* ¶ 134, while VWGoA Services, the tied product, *id.* ¶ 136, belongs to any or all of "the data processing (e.g. application developers), data storage (e.g. cloud and/or personal storage), and other usage data market (other services using such data)" markets, *id.* ¶ 134. Taken together with the subsequent allegation that "VWGoA's unlawful tying arrangement thus ties two separate products that are in separate markets," the complaint alleges that VWGoA Services does not fall within the telematics data market or telematics data access market. *Id.* ¶ 136.

It is not clear, then, what products *do* fall within the telematics data access market, other than "data access." *See id.* ¶¶ 122, 134. But even though Smartcar never defines this market's boundaries, the complaint consistently asserts its existence. Smartcar alleges, for example, that "VWGoA imposes restrictions on the telematics data market," *id.* ¶ 9; that the VWGoA Services terms "grant VWGoA a monopoly on the unique type of data generated by their vehicles," *id.* ¶ 60; that "VWGoA enjoys a monopoly over data from the vehicles it makes and sells to Vehicle Owners," *id.* ¶ 86; and that "VWGoA restricts the market for its Vehicle Owners' data" via the user agreements, *id.* ¶ 121. Smartcar also describes itself as a consumer of "vehicle data," calling into question whether Smartcar intends to allege that it competes with VWGoA in the telematics data market or that it is being harmed as a consumer of the data that VWGoA allegedly produces. *Compare id.* ¶ 141 (identifying Smartcar as "a business that consumes vehicle data"),

United States District Court
Northern District of California

1   with *id.* ¶ 7 ("VWGoA seeks to quash all competitors for telematics data related services for its

2   vehicles—Smartcar included")*, and id.* ¶ 170 ("Smartcar, as VWGoA's competitor, is unable—

3   reasonably or practicably—to duplicate the vehicle telemetry data access system solely available

4   to VWGoA.").

5       Another recurrent issue is the shifting scope of the alleged markets.  As VWGoA notes, the

6   complaint often uses VWGoA-specific language and general terms interchangeably without

7   acknowledging the difference.  *See* ECF No. 101 at 20.  The allegations concerning VWGoA's

8   alleged monopoly provide an example.  Smartcar asserts the conclusion that "[t]he VWGoA

9   telematics data market and VWGoA vehicle telemetry data access market are valid antitrust

10  markets," *id.* ¶ 164, then alleges that VWGoA monopolizes "the *VWGoA* telemetrics data market

11  and the *VWGoA* telemetry data access market," *id.* ¶ 165 (emphasis added).  In the next allegation,

12  although it is ostensibly referring to the same monopoly that it just alleged, Smartcar shifts to

13  broader terms:  "VWGoA unlawfully maintains its monopoly power *in the telematics data market*

14  and *telemetry data access market* through the anti-competitive acts described herein . . . ."

15  *Id.* ¶ 166 (emphasis added).  Do these latter terms mean to encompass producers other than

16  VWGoA?  The counterclaims do not say.  This blurriness pervades the complaint and makes the

17  intended market definitions inscrutable.[7]

18                          **d.     Geographic Scope of Market**

19      Smartcar's market definitions are also insufficient because the complaint contains no

20  allegations about the geographic component of any alleged market.  There is no information about

21  the "'area of effective competition' in which 'buyers can turn for alternative sources of supply.'"

22  *Pac. Steel Grp. v. Com. Metals Co.*, No. 20-cv-07683-HSG, 2021 WL 2037961, at *4 (N.D. Cal.

23  May 21, 2021) (quoting *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001)).

24

25  _____

    [7] In light of these conclusions, the Court does not address VWGoA's argument that Smartcar lacks
26  antitrust standing.  The Court can only address that issue once the relevant market has been clearly
    defined because the Court needs to know whether Smartcar is a participant in the relevant market.
27  "The requirement that the alleged injury be related to anticompetitive behavior requires . . . that
    the injured party be a participant in the same market as the alleged malefactors."  *Eagle v. Star-*
28  *Kist Foods, Inc.*, 812 F.2d 538, 540 (9th Cir. 1987) (quoting *Bhan v. NME Hospitals, Inc.,* 772
    F.2d 1467, 1470 (9th Cir. 1985)).

United States District Court
Northern District of California

1    Smartcar contends that its allegations mentioning the United States suffice to allege that

2 the relevant market consists of the United States.  ECF No. 102 (citing Counterclaim

3 Compl. ¶¶ 93–95).  The cited allegations assert that applications created using Smartcar are

4 compatible with "a majority of the over forty-two Automobile OEM brands in the United States,"

5 Counterclaim Compl. ¶ 93, before alleging that application developers would need to tailor their

6 applications for individual Automobile OEMs without Smartcar's platform, *id.* ¶¶ 94–95.  This

7 information does not allege the scope of a relevant market.  *See POURfect Prods. v. KitchenAid*,

8 No. CV–09–2660–PHX–GMS, 2010 WL 1769413, at *3 (D. Ariz. May 3, 2010) (granting

9 dismissal under Rule 12(b)(6) where plaintiff alleged a market existed "in the United States and

10 other countries" but failed to allege "*which* other countries or which parts of the United States"

11 were included in the market); *see also* Counterclaim Compl. ¶ 22 (alleging that Smartcar has

12 clients in Europe as well as the United States).  Smartcar also seeks refuge in VWGoA's

13 allegations in its Second Amended Complaint regarding the scope of VWGoA's operations, but

14 the Court may not look outside the four corners of the counterclaim complaint to define the

15 geographic market.  *See Chukwudebe v. Lu*, No. C-13-5466-EMC, 2014 WL 46650, at *1 (N.D.

16 Cal. Jan. 6, 2014) (stating that "a district court is confined by the facts contained in the four

17 corners of the complaint") (citing *Americopters, LLC v. FAA*, 441 F.3d 726, 732 n.4 (9th Cir.

18 2006)).

19    The failure to allege any geographic component of a relevant market compounds the

20 deficiencies identified above and provides another basis for dismissal.  *See, e.g.*, *Sidibe v. Sutter

21 Health*, 4 F. Supp. 3d 1160, 1175 (N.D. Cal. 2013) (dismissing Sherman Act claims where

22 plaintiffs pleaded the general existence of "local markets" but failed to identify them specifically);

23 *Reilly*, 578 F. Supp. 3d at 1109 (dismissing Sherman Act claims where, despite allegations that

24 relevant market encompassed all transactions on Apple's App Store "worldwide," complaint

25 lacked "allegations sufficient to support the global geographic scope" proposed, such as an

26 allegation that "users in every country access the same App Store storefront").

27    In sum, Smartcar has alleged multiple product markets without supporting allegations

28 about what those markets are and what products they include.  The complaint makes no principled

distinction among the markets for data processing services, applications, telematics data, telematics data access, or the various other market definitions alleged.  Allegations that do not posit the relevant markets' boundaries or relationships with one another—or any geographic component—do not state a plausible claim for relief.  *See Coronavirus Rep.*, 85 F.4th at 956–57; *Am. Express Co.*, 585 U.S. at 543 (without an adequate market definition, "there is no way to measure [the defendant's] ability to lessen or destroy competition" (internal quotation marks and citation omitted)); *see also hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137, 1148 (N.D. Cal. 2020) (dismissing Sherman Act claims where "the parameters of the people analytics market" were "vague" because "it [was] not clear what substitutes there are for people analytics products such as those offered by hiQ").  Because Smartcar fails to meet the "threshold step of defining a relevant market," *Coronavirus Rep.*, 85 F. 4th at 956, the Court will dismiss its Sherman Act claims.

### C.      Cartwright Act

Like Section 1 of the Sherman Act, California's Cartwright Act bans agreements that "prevent competition in . . . [the] sale or purchase of . . . any commodity."  Cal. Bus. & Prof. Code § 16720(c).  "Because it was modeled after the Sherman Act, '[t]he analysis under California's antitrust law mirrors the analysis under federal law.'"  *Pac. Steel Grp. v. Com. Metals Co.*, 600 F. Supp. 3d 1056, 1080 (N.D. Cal. 2022) (quoting *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001)).  That is, for both California and federal antitrust claims, "a plaintiff must allege that the defendant has market power within a legally cognizable relevant market."  *Dang v. San Francisco Forty Niners*, 964 F. Supp. 2d 1097, 1104 (N.D. Cal. 2013).  The Court's conclusion that Smartcar has not adequately pleaded a relevant market is therefore fatal to Smartcar's Cartwright Act claims.

### D.      UCL

When a UCL claim is derivative of a plaintiff's antitrust allegations, the UCL claim rises or falls with those claims.  *City of San Jose v. Off. of the Comm'r of Baseball*, 776 F.3d 686, 691–92 (9th Cir. 2015).  Smartcar contends that its steering allegations comprise a "separate basis for the UCL claim."  ECF No. 102 at 9 n.13.  On the face of the complaint, however, the allegations

1    of unlawful conduct are predicated on Sherman Act violations.  *See, e.g.*, Counterclaim

2    Compl. ¶ 124 ("VWGoA's conduct violates the Sherman Act and the Cartwright Act, and *thus*

3    constitutes unlawful conduct under § 17200.") (emphasis added).

4          Because Smartcar's UCL claims are predicated on its antitrust claims, the Court dismisses

5    them for the reasons stated above.  *See Sidibe*, 4 F. Supp. 3d at 1181; *see also Pac. Steel Grp.*, 600

6    F. Supp. 3d at 1081–82 (finding that plaintiff's UCL claim was "a tag-along claim that can be

7    resolved summarily"); *In re Napster, Inc. Copyright Litig.*, 354 F. Supp. 2d 1113, 1126 (N.D. Cal.

8    2005) (dismissing UCL claims, explaining that "[t]his argument is obviously mooted by the

9    court's disposition of [counter-plaintiff's] antitrust claims and thus need not be addressed here").

10         **E.    Breach of Contract**

11         Finally, Volkswagen argues that Smartcar has failed to adequately state a claim for breach

12   of contract based on the Commitment that VWGoA originally ratified in 2014 and reaffirmed in

13   summer 2023.  ECF No. 101 at 24–26.  Specifically, Volkswagen argues that Smartcar has not

14   plausibly alleged (1) that the agreement is a contract; or, if there is a contract, (2) that Smartcar is

15   a third-party beneficiary.  *Id.*  Smartcar alleges that VWGoA has failed to perform its contractual

16   obligations to provide access to data from its vehicles to industry participants and that Smartcar is

17   entitled to enforce the Agreement as a third-party beneficiary.  Counterclaim Compl. ¶¶ 98–106,

18   177–84.

19         The essential elements of a contract under California law are (1) parties capable of

20   contracting; (2) those parties' consent; (3) a lawful object; and (4) a sufficient cause or

21   consideration.  Cal. Civ. Code § 1550.  "[T]he elements of a cause of action for breach of contract

22   are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3)

23   defendant's breach, and (4) the resulting damages to the plaintiff."  *Oasis W. Realty,*

24   *LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011) (citation omitted).

25         Smartcar has not plausibly alleged that the Commitment is a contract.  Smartcar asserts the

26   legal conclusion that "VWGoA entered into express or implied contractual commitments in the

27   Automotive Repair Sharing Commitment," Counterclaim Compl. ¶ 178, but alleges no facts

28   supporting an inference of the mutual assent or consideration required for contract formation.  The

United States District Court
Northern District of California

21

1   Court cannot infer from the counterclaims or from the Commitment itself that any promisees to

2   the Commitment "confer[red] a benefit or suffer[ed] a prejudice" such that they "actually

3   bargained for [] the exchange for the promise or have induced the promisor's promise." *Diaz v.*

4   *Tesla, Inc.*, 598 F. Supp. 3d 809, 829 (N.D. Cal. 2022) (citing *Prop. Cal. SCJLW One Corp. v.*

5   *Leamy*, 25 Cal. App. 5th 1155, 1165 (2018)).  "'[T]he tenet that a court must accept a complaint's

6   allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported

7   by mere conclusory statements.'"  *Gerstle v. Am. Honda Motor Co., Inc.*, No. 16-CV-04384-JST,

8   2017 WL 2797810, at *3 (N.D. Cal. June 28, 2017) (quoting *Iqbal*, 556 U.S. at 678).

9   Accordingly, Smartcar has failed to state a claim for breach of contract.[8]

### CONCLUSION

10  For the foregoing reasons, the Court grants VWGoA's motion to dismiss Smartcar's

11  Counterclaims II–VI.  ECF No. 101.  Leave to amend is granted solely to cure the deficiencies

12  identified in this order.  Smartcar must file any amended pleading within 21 days.  If no amended

13  complaint is filed, the case will proceed only as to Counterclaim I.

14  **IT IS SO ORDERED.**

15  Dated:  September 25, 2024



JON S. TIGAR
United States District Judge

United States District Court
Northern District of California

---

[8] Having found that Smartcar does not plead the existence of a valid contract, the Court does not reach the question of whether Smartcar is a third-party beneficiary of the Commitment, but the Court has its doubts.  The language of the Commitment is almost entirely focused on the "right to repair" and the rights of independent repair facilities under the Commitment. *See, e.g.,* ECF No. 102-1 at 69 ("If an independent repair facility or owner believes that a manufacturer has failed to provide the information or tool required by this MOU, he may challenge the manufacturer's actions by first notifying the manufacturer in writing.").  Smartcar is not an independent repair facility.

22